**John ROYSTER, Appellant,**

**v.**

**William H. FAUVER and Christopher Dietz, Appellees.**

**No. 84–5887.**

United States Court of Appeals, Third Circuit.

Argued June 10, 1985.

Decided Oct. 18, 1985.

Joseph H. Rodriguez, Public Advocate-Public Defender, State of N.J., Leigh B. Bienen (argued), Asst. Deputy Public Defender, Special Projects Section, Department of Public Advocate, Trenton, N.J., for appellant.

Irwin I. Kimmelman, Atty. Gen., of N.J., James J. Ciancia, Asst. Atty. Gen., Catherine M. Brown (argued), Deputy Atty. Gen., Trenton, N.J., for appellees.

* Honorable Maurice B. Cohill, Jr., United States District Judge for the Western District of Pennsylvania, sitting by designation.

Before HIGGINBOTHAM, BECKER, Circuit Judges and COHILL, District Judge.*

## OPINION OF THE COURT

EDWARD R. BECKER, Circuit Judge.

This case, arising under 42 U.S.C. § 1983 (1982), requires us to consider whether the application of the New Jersey Parole Act of 1979, N.J.Stat.Ann. § 30:4–123.45 et seq. (West 1981 & Supp.1985), to a prisoner who committed an offense in 1968 is a violation of the ex post facto clause of the federal Constitution.[1] Because the standards for parole eligibility established by the 1979 law are substantially similar to those in effect at the time of the offense, and the regulations adopted pursuant to the 1979 law did not harm the prisoner in any way, we find that there is no unconstitutionality, and affirm the judgment of the district court, which denied relief.

I. *The Appellant's Crime, his Sentencing, and his Original Eligibility for Parole*

In 1968, appellant John Royster shot Carmen Rappella, a widow and mother of three, five times at close range with a .22 calibre handgun while he robbed the cash register of her small grocery store. Royster was convicted of first degree murder, and was sentenced to death pursuant to the provisions of Title 2A Criminal Code, N.J. Stat.Ann. § 2A:1–1 et seq. (repealed, Sept. 1, 1979 by N.J.Stat.Ann. § 2C:1–1 et seq. (West 1982 & Supp.1985)). *State v. Royster,* 57 N.J. 472, 273 A.2d 574, *cert. denied,* 404 U.S. 910, 92 S.Ct. 235, 30 L.Ed.2d 182 (1971). On review, the New Jersey Supreme Court noted that twenty-five veniremen had been excused for cause because they had stated that they had conscientious scruples against the death penalty. *Id.* at 489–90, 273 A.2d at 583–84. The Court found that the exclusion of these prospective jurors was "a clear violation of

1. The clause says "[n]o State shall ... pass any ... ex post facto Law...." U.S.Const. art. I, § 10, cl. 1.

the principle set forth by the Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)." *State v. Royster*, 57 N.J. at 490, 273 A.2d at 584. The Court therefore reduced Royster's death sentence to life imprisonment. *Id.* at 492, 273 A.2d at 585.

As a result of Royster's resentencing, the provisions of the state's parole laws became applicable to him. According to the parole laws originally enacted in 1948 and in effect at the time Royster committed his offense, N.J.Stat.Ann. § 30:4–123.1 *et seq.* [referred to hereinafter as the "Parole Act of 1948" or the "1948 Act"], *repealed*, April 20, 1980, N.J.Stat.Ann. § 30:4–123.45 *et seq.* [referred to hereinafter as the "Parole Act of 1979" or the "1979 Act"], Royster would be eligible for parole in 1981.

## II. Changes in the New Jersey Sentencing and Parole Laws

### A. The old and new parole acts

■ The Parole Act of 1948 required the New Jersey Parole Board to consider two factors in determining whether a prisoner was eligible for parole. The Board could approve parole only if it had determined that

> [1] there is a reasonable probability that, if such prisoner is released, he will assume his proper and rightful place in society without violation of the law, and
>
> [2] ... his release is not incompatible with the welfare of society.

N.J.Stat.Ann. § 30:4–123.14 (repealed). The first factor is clear: a prisoner could be released only if the Board believed that the prisoner would not commit a crime again. The second factor, incompatibility with the welfare of society, is less than pellucid. As interpreted by the New Jersey Supreme Court (which we are bound to follow on this point), the second factor required the Board to find that the "punitive aspects" of a prisoner's sentence had been accomplished; that is, that the defendant had served a period commensurate with, and demonstrated contrition appropriate to, the gravity of his crime. *See In re Tranti-*

*no Parole Application*, 89 N.J. 347, 368, 446 A.2d 104, 114–15 (1982).

■ In 1979, the New Jersey penal laws underwent a significant change. The state adopted a new Code of Criminal Justice ("New Code") and the Parole Act of 1979. For present purposes, the significant difference between the old and new systems is that the new system shifted from the Parole Board to the sentencing judge the responsibility of seeing to it that the "punitive aspects" of a convicted person's sentence would be satisfied. *See infra* note 2. The New Code did this by imposing mandatory minimum sentences for many crimes, thus making parole eligibility a function of the sentence received. *See, e.g.,* N.J.Stat. Ann. § 2C:43–6 (establishing mandatory minimum term during which prisoners are not eligible for parole). The authors of the New Code intended that as a result of these changes, by the time a prisoner became eligible for parole the punitive objectives of his sentence would have been satisfied. *See In re Trantino Parole Application*, 89 N.J. at 369, 446 A.2d at 115 ("The longer sentences and mandatory minimum terms anticipated under the [new] Code serve to insure that the punitive aspects of the inmate's sentence will be satisfied by the time parole elgibility arrives"); *see also infra* note 2.

The discretion of the Parole Board was accordingly limited. The Board was no longer to consider whether the punitive aspect of a prisoner's punishment had been served. The 1979 Act required the Board to focus exclusively on whether the prisoner would likely commit crimes if granted a parole.

> An adult inmate shall be released on parole at the time of parole elgibility, unless [it is demonstrated] ... by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime under the Laws of this State if released.

N.J.Stat.Ann. § 30:4–123.53(a) [New Code]. This single factor test is essentially the same as the first factor considered under

the Parole Act of 1948. It focuses exclusively upon recidivism, and it does not take into account the punitive aspects of an inmate's punishment.[2]

### B. *The Trantino Decision*

In 1982, the New Jersey Supreme Court decided *In re Trantino Parole Application,* 89 N.J. 347, 446 A.2d 104 (1982) which involved the application of the Parole Act of 1979 to a prisoner who had been convicted of murder under the old criminal code (such prisoners will be referred to hereinafter as "pre-Code inmates"). The prisoner, Thomas Trantino, had had a parole hearing at which the Parole Board had determined that it did not believe that Trantino would commit illegalities if released on parole. The Board, pursuant to its understanding of the dictates of the Parole Act of 1979, therefore recommended that Trantino be granted parole. *Id.* at 353–54, 446 A.2d at 107.

The parole decision eventually came before the New Jersey Supreme Court, which vacated the decision of the Parole Board. The Court ruled that whereas inmates who were convicted under the New Code "will have presumptively satisfied all punitive aspects of their sentences at the time they become eligible for parole," *id.* at 370, 446 A.2d at 116, that was not true of the pre-Code inmates. The Court reasoned that because the sentences of pre-Code inmates were not calculated with an eye toward the punitive aspects of their punishment, it was possible that by the time they were eligible for parole those aspects would not be satisfied. According to the Court, "[t]he punitive aspects of their sentences will not necessarily have been fulfilled by the time parole eligibility has occurred." *Id.* Thus, the Court concluded, when considering the applications for parole of pre-Code inmates, the Board must consider both the likelihood of recidivism and whether the punitive aspects of the inmate's sentence have been satisfied. *Id.* at 373, 446 A.2d at 117.

### III. *Royster's Parole Hearings and the Procedural History of this Case*

### A. *Royster's case before the Trantino Decision*

Royster became eligible for parole consideration in 1981.[3] His application for parole was processed pursuant to the procedures established by the 1979 Act. He was interviewed by a panel of the Parole Board on October 8, 1981 and on that date was granted parole, effective November 24, 1981. The Monmouth County Prosecutor objected to Royster's parole and requested review by the full Parole Board. Royster's parole was stayed pending the review. On December 8, 1981, the full Parole Board met to reconsider Royster's release. The Board approved Royster's release, and December 9, 1981 was set as the new release date.

The Prosecutor appealed the decision of the full Board to the Appellate Division of the New Jersey Superior Court. Royster's release was once again stayed pending appeal. The Appellate division affirmed the parole release decision in *State v. Royster,* No. A–1397–81T4 (N.J.Super.App.Div. Mar. 5, 1982) (unpublished opinion). The court found that on review of the record "the

---

**2.** The effect and purpose of the new penal laws were summarized by the committee that sponsored the Parole Act:

This [parole] bill would require the authorities to show that the inmate is likely to commit a crime if he is released on parole. This shift accords with the existing practicalities of parole procedure, complements the generally longer sentences of the new Criminal Code, and renders the process more objective and consistent.... [T]his shift complements the longer sentences of the Code in further moving the power to incarcerate, the power to decide how long a convict should serve in order to satisfy the punitive and retributive aspects of a sentence, from the parole process to the sentencing process.

Assembly Committee Statement to Assembly No. 3039 (1979).

**3.** The 1979 Act states that inmates like Royster who were sentenced pursuant to Title 2A of the old Criminal Code have their initial parole eligibility date computed according to the formula set forth in the 1948 Act. *See* N.J.Stat.Ann. § 30:4–123.51(g); N.J.Stat.Ann. § 30:4–123.11. Therefore, Royster's initial date of parole eligibility is not an issue in this case.

preponderance of the evidence does not show a substantial likelihood that [Royster] will commit a crime if paroled," and therefore that the parole test of the Parole Act of 1979 had been satisfied.

Although it appeared that Royster had gotten by the final obstacle to his parole, in fact his problems were only beginning. Four days after the decision of the lower court, the New Jersey Supreme Court ordered a stay of Royster's release pending its decision in *Trantino*.

B. *The effect of the Trantino Decision on Royster's case—The Parole Board Proceedings*

*Trantino's* holding, as discussed above, was that for pre-Code inmates like Royster the Parole Board should consider both recidivism and the punitive aspects of punishment. The Parole Board and the appellate division had considered only Royster's likelihood of recidivism. Therefore, on the same day that *Trantino* was decided, May 20, the New Jersey Supreme Court granted the petition and cross-petition for certification filed in *Royster,* and summarily remanded the case to the Parole Board for reconsideration in light of *Trantino*. *State v. Royster,* 91 N.J. 208, 450 A.2d 539 (1982).

The Parole Board held another hearing on December 16, 1982. In a decision dated February 4, 1983, the Board rejected Royster's application for parole and extended his parole eligibility date (the next time he would be eligible for parole) by nine years. As the Board's analysis is crucial to this appeal, we quote from the decision at length:

> Mr. Royster's activities and conduct have resulted in his being evaluated as an above average inmate by the Department of Corrections personnel and the Board has received numerous positive reports from treatment, supervisory, and custody staff. However, these expressions of positive improvement and outstanding ratings were not sufficient, in the opinion of the Board, to overcome and satisfy the punitive aspects of his sentence for this heinous and execution type murder. The Board recognizes that Mr. Royster has been incarcerated since 1968 and doubts that this period of incarceration is sufficient for Mr. Royster to truly demonstrate his rehabilitation. The Board is further concerned that Mr. Royster's continuous denial of guilt against overwhelming evidence may have impeded the rehabilitative process.

> The Supreme Court, in the *Trantino* decision, clarified the Board's function with regards to pre-Penal [New] Code prisoners. The Board is now required to reassess the punitive aspects of a pre-Penal Code sentences in order to determine whether the offender's punishment has been adequate to insure his individual progress toward rehabilitation. The Board in this matter must therefore consider the serious and heinous nature of this murder and the quality use of the time served to date and evaluate whether there has been sufficient punishment. It is the opinion of the State Parole Board, based on the cruel, vile, callous, and heinous circumstances of this murder with the further aggravation that it was committed during the commission of a crime, that the punitive aspect of Mr. Royster's sentence has not been satisfied. It is the decision of the State Parole Board to deny Mr. Royster parole.

> In establishing the future eligibility term the Board has considered that if Mr. Royster had been convicted and sentenced under the Penal Code it is almost certain that he would not have been eligible for an additional substantial period of time. Under the code Mr. Royster could have received a life term with earliest possible parole date coming after 25 years of custody.... It is therefore the decision of the State Parole Board to establish a future parole eligibility term of nine (9) years.

To appreciate the significance of the disposition, it is necessary to put it into context. The New Jersey Administrative Code title 10A, section 71–3.19(a)(1) (1982) states that when a prisoner convicted of murder is

first denied parole, the "primary [future] eligib[ility]" for parole should be 27 months. That is, the prisoner should only have to wait 27 months before becoming eligible again. The 27-month period is not mandatory, but merely a guideline that the Parole Board may exceed, *see* N.J.Stat. Ann. § 30:4–123.56(b); N.J.Admin.Code tit. 10A, § 71–3.19(d), as it did in Royster's case. This flexibility notwithstanding, the disparity between the administrative code's primary future eligibility term and Royster's nine-year future eligibility term demonstrates the severity of the latter.

### C. *Royster's Challenge to the Parole Board's Post-Trantino Decision*

Royster challenged the Board's decision on several fronts. On January 25, 1983, he filed a Notice of Appeal to the Appellate Division.[4] On February 8, he filed the instant § 1983 action in the district court for the District of New Jersey, alleging the unlawful application of ex-post facto laws to his case, and seeking equitable and monetary relief. On February 22, he filed a *pro se* administrative appeal against the Parole Board seeking reconsideration.

Two of Royster's challenges were quickly stopped in their tracks. His administrative appeal was denied by the Parole Board on April 18, and his request for equitable relief in his federal suit was dismissed on the grounds of equitable abstention. *Royster v. Fauver* (D.N.J.) (June 20, 1983). The district court stayed Royster's request for monetary damages pending resolution of the case in the state courts. *Id.*

Royster's appeal in the state system met a slightly different fate because Royster's legal path intersected once again with that of Thomas Trantino. While Royster's appeal was pending in the state appeals system, the Appellate Division decided *In re Parole Application of Trantino*, No. A–1382–82 (N.J.Super.App.Div. April 25, 1983) (unpublished opinion) which held that N.J. Admin.Code tit. 10A, § 71–3.19(d)(2) and (3) required that the Parole Board not extend

an inmate's parole dates beyond the primary future eligibility dates established by regulation unless (i) the Parole Board gave the inmate 14-days' notice of the Board's intention to extend his future eligibility term, and (ii) after the decision, the Board gave the inmate written reasons for the Board's decision. Because Royster's future eligibility term far exceeded the 27-month primary eligibility term, and because Royster had not been given 14-days' notice, it was clear after *Trantino* that Royster's parole decision had been treated in a procedurally deficient manner. The Board therefore informed Royster that it would reconsider his extension in the procedurally proper manner. On account of the resumption of the administrative process, the Appellate Division dismissed Royster's petition of appeal as interlocutory on June 16. *New Jersey State Parole Board v. Royster*, No. A–2218–82T3 (N.J.Super.App.Div. June 16, 1983) (unpublished decision).

The Parole Board quickly mended the procedural infirmities that had beset its earlier efforts. By letter of May 9, the Board gave Royster notice that it intended to extend his parole eligibility date. Then, by letter of July 6, the Board advised Royster that "based on the serious and heinous nature of the homicide committed by you, and the fact that the homicide was committed during the commission of a crime and the fact that the punitive aspects of your sentence have not been satisfied, the Board is of the opinion that the establishment of future parole eligibility date pursuant to present guidelines is clearly inappropriate. Accordingly, the State Parole Board has established … a future parole eligibility term of nine (9) years in your case."

On July 22, Royster filed a new appeal in the state appellate division challenging the validity of the Parole Board's determination to deny him parole. His appeal was denied in a per curiam decision in *Royster v. New Jersey State Parole Board*, A–5575–82T4 (N.J.Super.App.Div. April 19, 1984) (unpublished opinion), and the New

---

**4.** Royster had been informed of the Board's decision before its Notice of Decision was complete. Thus, he was able to file his appeal 10 days before the date of the Notice of Decision.

Jersey Supreme Court denied Royster's petition for certification. 97 N.J. 656, 483 A.2d 178 (1984).

His state remedies exhausted, Royster resumed his suit for damages in federal district court, moving for summary judgment alleging unconstitutional application of ex post facto laws.[5] The district court denied the motion and granted summary judgment for the defendants. Royster appealed.

### IV. *Issue on Appeal*

From this labyrinthine procedure emerges but one issue: was it a violation of the ex post facto clause of the Constitution, art. I, § 10, cl. 1, for the Parole Board to apply the Parole Act of 1979 in Royster's case? Royster argues that the Act itself and the regulations adopted pursuant to the Act work ex post facto violations on him. For the reasons stated below, we disagree.

### A. *The parole eligibility standards of the 1948 and 1979 Acts*

■ When confronted with the claim that a parole law has worked an ex post facto violation on an inmate, a court must compare the allegedly offensive parole law with the parole law in effect at the time of the inmate's crime. *United States ex rel. Forman v. McCall*, 709 F.2d 852, 856 (3d Cir.1983) ("It is a fundamental principle of ex post facto jurisprudence that a court entertaining an ex post facto claim must focus upon the law in effect at the time of the offense for which a person is punished.") (citations omitted). In comparing the laws, the court must ask whether the parole standards of the newer act are more rigorous or burdensome than were the standards of the older one. *Geraghty v. United States Parole Commission*, 579 F.2d 238, 264 (3d Cir.1978) (the court must ask whether " 'the later standard of punishment is more onerous than the earlier.' ") (quoting *Lindsey v. Washington*, 301 U.S. 397, 400, 57 S.Ct. 797, 798–99, 81 L.Ed.

1182 (1937)), *vacated and remanded on other grounds*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed. 479 (1980). If the newer standards are more rigorous, then to apply them to the inmate would be a violation of the ex post facto clause. The relevant question in the case before us, therefore, is whether the standard for parole eligibility applied to Royster by the Parole Act of 1979 is more onerous than that which would have been applied to him pursuant to the Parole Act of 1948.

■ As should be clear from the foregoing discussion of the two acts, *supra* Part II, the standards the acts apply to those in Royster's position—murderers convicted and sentenced before the institution of the New Code—are precisely the same. Under either statute, the Parole Board and reviewing court must consider recidivism and "welfare of society," or punitive aspects, *see supra*, p. 529. Comparison of the acts' standards thus yields no ex post facto problems.

■ Royster argues that notwithstanding the facial identity of the standards, the 1979 Act as applied in his case was more burdensome than the 1948 Act would have been. Royster contends that the Parole Board thought that it was bound to "equalize" the effective sentences of those incarcerated for murder before and after the New Code; that is, although the Parole Board spoke as if it were considering the punitive aspects of his sentence, in fact it felt constrained to follow the sentencing provisions of the New Code. Royster argues that since applying the New Code's sentencing provisions directly in his case would clearly be unconstitutional, so too was the Board's decision here because it was effectively the same thing. In support of his position, Royster notes that (i) adding the nine-year future eligibility term to the time he has already served means that he will be in prison at least 25 years, exactly the term he would have been required to serve as a new code inmate, and (ii) in its

---

**5.** Because Royster had preserved his federal constitutional claim pursuant to *England v. Louisiana Board of Medical Examiners,* 375 U.S. 411,

84 S.Ct. 461, 11 L.Ed.2d 440 (1964), it was not barred by principles of res judicata.

February 4 decision, the Parole Board referred to the sentence he would have received had he been tried under the new code in explaining and justifying its decision.

There is some question whether this is an ex post facto argument at all. It may be merely an argument of statutory interpretation—that the Parole Board misinterpreted the 1979 Act. If this rises to constitutional dimensions, it likely does so under the due process clause rather than the ex post facto clause. We need not decide this issue here, however, for Royster's factual premises do not lead to the conclusion he asserts. In the first place, one Board member specifically stated during the December 16 hearing that the Board should not view the case as equivalent to a case under the New Code. This statement indicates that the Board was not under the mistaken impression that treatment of the pre-Code and more recent inmates should be identical.

Second, even with the nine-year future eligibility term, Royster's current sentence does not match the sentence he would have received had he been tried and sentenced under the New Code. Because Royster is eligible for prison credits, even with the nine-year period he may be eligible for parole by 1987 or 1988, nineteen or twenty years after he entered prison. Had he been sentenced under the New Code, Royster would have had to serve until at least 1993. See N.J.Stat.Ann. § 2C:43–7(b)(c) (mandatory minimum twenty-five year term for murder).

Further evidence against Royster's argument is that the Board's decision was clearly influenced by factors other than the New Code's sentencing provisions. In its February 4 decision, for example, the Board noted that Royster had continually denied his guilt despite overwhelming evidence against him, see supra pp. 531–532, and it suggested that this had been a factor in denying Royster his parole. In its July 6 letter, the Board stated that the brutality of Royster's crime had influenced its decision. See supra pp. 532–533. Because an inmate's contrition and the gravity of his crime are relevant to the

determination of whether the punitive aspects of his term have been served, the Board's consideration of these factors was appropriate. It demonstrates that the Board was not concerned simply with equalizing the effective sentences of pre-Code and recent inmates.

█ Finally, the fact that the Parole Board referred to the New Code's sentencing terms does not mean that the Board was surreptitiously applying the New Code to Royster. The Board had legitimate reason for referring to the New Code. The 1948 Act required the Parole Board, and the 1979 Act requires the sentencing judge, to take criminal retribution into account In re Trantino, 89 N.J. at 368, 446 A.2d at 115 ("society's need for adequate punishment"), in assessing the punitive aspects of an inmate's sentence. The assessment is necessarily discretionary, In re Hawley, 98 N.J. 108, 121, 484 A.2d 684, 690 (1984) (Handler, J., concurring), depending on evolving standards of the sufficiency of punishment and the particular inmate in each case. Cf. Greenholtz v. Inmates of Nebraska Penal & Cor. Complex, 442 U.S. 1, 8, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668, 676 (1979) (the parole decision "requires the Board to assess whether, in light of the nature of the crime, the inmate's release will minimize the gravity of the offense, weaken the deterrent impact on others, and undermine respect for the administration of justice"). The New Code's sentencing provisions were designed with an eye towards satisfying the punitive aspects of sentencing. See supra Part II.A. Because the New Code indicates society's standards and attitudes toward punishment, it was neither surprising nor inappropriate that the Board considered what sentence Royster would have received under the New Code in determining what future eligibility term would satisfy the punitive aspects of Royster's case.

B. *The alleged ex post facto violations worked by the Parole Board's regulations*

█ This circuit, alone among all others, maintains that parole regulations may be laws for purposes of ex post fact analysis.

*United States ex rel. Forman v. McCall,* 709 F.2d 852 (3d Cir.1983); *id.* at 860 (collecting cases from other circuits). Royster argues that the regulations in accordance with which his proceeding was held, promulgated in 1980, are in significant and relevant respects more severe than were the regulations that had previously been in force. Thus, Royster argues, the regulations do work an ex post facto violation in his case.

Royster identifies two ways in which he was hurt by the 1980 regulations. First, he states that under the older regulations, inmates given long future eligibility terms were guaranteed annual reviews, whereas the 1980 regulations had no such provision. He then argues that as the Parole Board's decision made no mention of annual rehearings in his case, he has suffered a hardship on account of an ex post facto law.

We need not reach the merits of this argument. One month after Royster filed his brief in this court, the State Parole Board amended N.J.Admin.Code, tit. 10A, § 71–3.19(e), to require annual review hearings for pre-Code inmates with future parole terms as long as Royster's. *See* 17 N.J.Admin.Reg. 1114 (May 6, 1985). Royster's argument is therefore moot.

■ Royster's second argument is that the the older regulations would not have permitted a nine year-future eligibility term. Royster identifies no provision of the now-repealed regulations that would have prohibited such a term, however, and we have found none in our independent review. *See* Rules of the New Jersey State Parole Board, Part VI (effective August 1, 1961). The relevant statutory section, N.J. Stat.Ann. § 30:4–123.19 (repealed), is similarly silent. Royster has thus failed to show that the current regulations impose a stricter standard than the older ones, a *sine qua non* for a cognizable ex post facto claim.

### V. *Conclusion*

We hold that application of the Parole Act of 1979 to Royster's parole application was not an ex post facto violation because (A) the standards of the 1979 and 1948 Acts are identical with respect to inmates convicted before 1979, and the Parole Board did not misapply those standards in Royster's case, and (B) the regulations promulgated pursuant to the 1979 Act did not prejudice Royster in any way. The judgment of the district court will be affirmed.